IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LIBERTY MUTUAL INSURANCE
COMPANY,                                          )
                                                  )
                    Plaintiff,                    )
                                                  )
v.                                                )         Civil Action No. 16-1613
                                                  )
PENN NATIONAL MUTUAL CASUALTY                     )
INSURANCE COMPANY,                                )
                                                  )
                    Defendant.                    )

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Liberty Mutual Insurance Company ("Liberty Mutual") brings this declaratory judgment action seeking a determination that Defendant Penn National Mutual Casualty Insurance Company ("Penn National") had a duty to defend Liberty Mutual's insured, Cost Company, in an underlying wrongful death action in which a construction worker was killed by a large concrete panel manufactured by Penn National's insured, Pittsburgh Flexicore Co. Inc. ("Flexicore").

In this action, Liberty Mutual seeks reimbursement from Penn National for the costs Liberty Mutual expended to defend Cost Company ("Cost") and the amount paid to settle the litigation on Cost's behalf, plus prejudgment interest on both amounts. The Court previously ruled on the parties' cross-motions for summary judgment in its Opinion and Order, dated August 15, 2018. (ECF Nos. 48, 49.) The Court denied Penn National's Motion for Summary Judgment, ECF No. 31, and granted Liberty Mutual's Motion for Summary Judgment, ECF No. 35, ruling that Penn National had a duty to defend Liberty Mutual's insured, Cost, as a matter of law. Now before the Court is Plaintiff Liberty Mutual's Motion for Summary Judgment on the Duty to Indemnify.

(ECF No. 61.) The Court heard oral argument and, after consideration of the parties' positions, filings, and argument, the Court will grant Liberty Mutual's Motion for Summary Judgment on the Duty to Indemnify and enter summary judgment in its favor and against the Defendant Penn National.

## I.    FACTUAL BACKGROUND

The underlying facts of this case were recounted in detail in the Court's August 15, 2018 Opinion. (ECF No. 48.) A slightly truncated factual background is set out here.

The underlying incident giving rise to the present action occurred over ten years ago during a construction project for a senior care home located at the Grandview Building in New Kensington, Pennsylvania. On that date, a laborer working on the project, Yamil Alexander Gonzalez, was killed when a Flexicore concrete panel collapsed on top of him. Liberty Mutual's insured, Cost, was a subcontractor on the project, who further subcontracted with Flexicore, Penn National's insured. The present action arose from Penn National's refusal to defend and indemnify Cost in the underlying state court action brought by the survivors of Mr. Gonzalez. Liberty Mutual contends that Cost is an "additional insured" under the policy Penn National issued to Flexicore pursuant to a Subcontract Agreement entered into between Cost and Flexicore.

### A.    Underlying Wrongful Death Action

On October 13, 2010, Karina Ramirez, Mr. Gonzalez's widow, individually and as administrator of Mr. Gonzalez's estate, along with Maria Gonzalez, Mr. Gonzalez's mother, filed a wrongful death action (the "Underlying Action") in the Court of Common Pleas of Allegheny County against several parties involved in the Grandview Building construction project, including Cost and Flexicore. *Ramirez v. Longwood at Oakmont, Inc.*, Court of Common Pleas of Allegheny County (PA) at G.D. No. 10-19146, Amended Complaint, Dec. 13, 2010; (ECF No. 1-2)

("Underlying Compl."). The genesis of the action was Mr. Gonzalez's work-related death; he was a laborer on the construction project when a large concrete panel manufactured and delivered to the project site by Flexicore collapsed from the ceiling above where he was working and killed him. Underlying Compl. ¶¶ 17-18, 16. The Underlying Complaint sets forth a Wrongful Death claim against Cost in Count V and a Survival Action claim against Cost in Count VI. *Id.* ¶¶ 61, 71-72. The Underlying Complaint also sets forth claims of "Wrongful Death (Products Liability)" and "Survival Action (Products Liability)" against Flexicore, which "designed and/or manufactured the concrete panels" for the construction project, at Counts IX and X, respectively. *Id.* ¶¶ 16, 92-113.[1]

B.     **Subcontract Agreement between Cost and Flexicore**

Cost and Flexicore entered into a subcontract in which Cost was identified as the Contractor[2] and Flexicore as the Subcontractor ("Subcontract Agreement"). Compl. ¶ 13; (ECF No. 64-1 ("Subcontract")). The Subcontract Agreement provides that Flexicore:

> agrees to furnish all necessary labor, material, services, equipment machinery, tools, and any other items proper or necessary in the doing of the work herein undertaken by the Subcontract to fully perform and in every respect complete the following items of work:
>
> **Manufacture, furnish, deliver to the project site, and install all required precast hollowcore plank and solid balcony slabs required at the Grandview Apartments** . . .

---

[1] The particular factual averments are more fully recounted in the Court's Opinion at ECF No. 48. The operative pleading in the Underlying Action, an "Amended Complaint in Civil Action", ECF No. 1-2 here, is referred to as "Underlying Compl.". The operative pleading in this Court, the Complaint, ECF No. 1, is referred to as "Compl.".

[2] This nomenclature is a bit confusing, in that as between Cost and Flexicore, Cost was in the position of the "contractor" and Flexicore was its subcontractor. But, Cost was also a subcontractor to a prime contractor on the overall project.

Subcontract, Art. First (emphasis in original). Following this Article, the parties inserted a handwritten provision, initialed by representatives from both sides, stating "Pittsburgh Flexicore Co. Inc. quotation 4380 dated July 10, 2008 will become part of this Subcontract Agreement." *Id.* Quotation 4380 excludes installation of the concrete planks by Flexicore. (ECF No. 1-3, at 19).

Article Twenty-Fourth of the Subcontract (the "Safety Provision") is titled "<u>Safety</u>" and provides in part that Flexicore "is solely responsible for the health and safety of its employees, agents, Subcontractors, and other persons on and adjacent to the Work Site. The Subcontractor, however, shall take all necessary and prudent safety precautions with respect to its work and shall comply, at Subcontractor's cost, . . . with all applicable laws, ordinances, rules, and regulations . . . for the safety of persons or property, . . ." Subcontract, Art. Twenty-Fourth.

Article Twenty-Fifth is titled "<u>Insurance</u>" and requires, in part, that Flexicore be responsible for providing General Liability insurance and Umbrella Liability insurance covering Cost as an Additional Insured on the policies Flexicore was obligated to obtain. *Id.* Art. Twenty-Fifth ("Subcontractor . . . will provide General Liability, Umbrella Liability, . . . insurance covering the . . . Contractor . . . (the "Additional Insured[]))." Article Twenty-Fifth further explains the insurance requirements imposed on Flexicore as follows:

> The obligation of [Flexicore] is to provide such adequate insurance to protect [Flexicore] and the Additional Insureds from <u>all</u> risks and/or occurrences that may arise or result, directly or indirectly from [Flexicore's] work or presence on the jobsite and <u>all</u> risks of injury to [Flexicore's] employees, sub-Subcontractors' employees, and other agents. . . . This obligation shall not be avoided by allegations of contributory or sole acts, failure to act, omissions, negligence or fault of the Additional Insureds. Each policy of insurance shall waive subrogation against the Additional Insureds. As such, each policy of insurance provided for herein, except Worker's Compensation, shall name [Cost] . . . as an additional insured under the policy, and each policy of insurance provided for herein shall be primary with no right of contribution against [Cost] . . . or their insurers.

*Id.* (emphasis in original).

Article Twenty-Sixth is titled "<u>General Indemnification</u>" and provides in part as follows:

> [Flexicore] shall protect, indemnify, hold harmless, and defend [Cost] . . . against any and all claims, causes of action, suits, losses, costs, or damages, including attorneys' fees, resulting from the acts, failure to act, omissions, negligence, or fault of [Flexicore] . . . whether or not said claim, cause of action, suit, loss, cost, or damage is alleged to be caused in part by any act, failure to act, omission, negligence, or fault of any of the Indemnities or their employees, and [Flexicore] shall bear any expense which any of the Indemnities may have by reason thereof, or on account of being charged with such claim, cause of action, suit, loss, cost, or damage, unless such claim, cause of action, suit, loss, cost, or damage is solely caused by the Indemnities sole act, failure to act, omission, negligence, or fault.

*Id.* Art. Twenty-Sixth.

### C.     The Penn National Policies

There were two relevant Penn National policies in effect on October 22, 2009. A general commercial liability policy, Policy No. CL9 0079173 (the "Penn National Policy"), and an umbrella insurance policy, Policy No. UL90079173 (the "Umbrella Policy"). (ECF Nos. 64-2, 64-3.) If Cost is deemed to be an additional insured under the Penn National Policy, it will also be an additional insured under the Umbrella Policy. (*See* ECF 64-3, at 40.) Thus, in its prior Opinion, the Court referred only to the provisions provided in the Penn National Policy in holding that Penn National had a duty to defend and the Court will do so here as well.

The Penn National Policy contains two relevant Additional Insured endorsement provisions. The first is an Endorsement concerned with "Ongoing Operations" titled "Automatic Additional Insureds – Owners, Contractors and Subcontractors (Ongoing Operations)." (ECF No. 64-2, at 103–4.) The "Ongoing Operations" Endorsement states in relevant part:

**A.** The following provision is added to **SECTION II – WHO IS AN INSURED**

1. Any person(s) or organization(s) (referred to below as additional insured) with whom you are required in a written contract or agreement to name as an additional insured, but only with respect to liability for "bodily injury",

- 5 -

"property damage" or "personal and advertising injury" caused, in whole or in part, by:

**(1)** Your acts or omissions; or

**(2)** The acts of omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location or project described in the contract or agreement.

A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

(*Id.* at 103.)

The second Endorsement is concerned with "Completed Operations" and is titled "Automatic Additional Insureds – Owners, Contractors and Subcontractors (Completed Operations)." (ECF No. 64-2, at 105.) The "Completed Operations" Endorsement states in relevant part:

**A.** The following provision is added to **SECTION II – WHO IS AN INSURED**

1. Any person(s) or organization(s) (referred to below as additional insured) with whom you are required in a written contract or agreement to name as an additional insured for the "products-completed operations hazard", but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work", at the location or project designated and described in the contract or agreement, performed for that additional insured and included in the "products-completed operations hazard".

A person's or organization's status as an additional insured under this endorsement ends when the obligation to provide additional insured status for the "products-completed operations hazard" in the written contract or agreement end.

(*Id.* at 129.)

### D.      Tender of Defense and Indemnification to Flexicore

By letter dated May 18, 2011, counsel retained by Liberty Mutual to represent Cost in the Underlying Action tendered Cost's defense and a claim for indemnification regarding the Underlying Action to Flexicore. (ECF No. 35-5, at 170.) Several additional letters tendering the Cost defense to Flexicore were sent, since no response was received from either Flexicore or Penn National. (*See* ECF Nos. 35-5, at 195 (dated May 24, 2011); 35-6, at 9 (dated Oct. 17, 2011), 11 (dated Oct. 17, 2011), 13 (dated Feb. 4, 2014).)

Nearly three years after Liberty Mutual's initial request, Penn National finally denied the tender in a letter dated March 28, 2014. (ECF No. 35-6, at 15-16.) Ultimately Liberty Mutual provided a defense to Cost in the Underlying Action, and Penn National provided a defense to Flexicore in that same proceeding. On July 17, 2015, Cost entered into a settlement in the Underlying Action. Compl. ¶ 48. Liberty Mutual filed the instant Complaint on October 24, 2016, seeking a declaration that Penn National had a duty to defend and indemnify Cost and that Liberty Mutual is therefore entitled to reimbursement from Penn National for Liberty Mutual's costs to defend and settle the Underlying Action, plus interest, attorneys' fees, and costs. *See generally* Compl.

### E.      The Court's Opinion on Penn National's Duty to Defend

On August 15, 2018, the Court issued an Opinion and Order denying Penn National's Motion for Summary Judgment and granting Liberty Mutual's Cross-Motion for Summary Judgment on the duty to defend, concluding that Penn National had the duty to Defend Liberty Mutual's insured, Cost, in the Underlying Action. (ECF Nos. 48, 49.) The Court held that the Ongoing Operations Endorsement, the Safety Provision, or the Completed Operations

Endorsement, or some combination of them, triggered Penn National's duty to defend. (ECF No. 48, at 10.)

As this Court then observed, under Pennsylvania law, a court may find that an insurer has a duty to defend when: (1) the court compares the four corners of the insurance contract to the four corners of the underlying complaint; (2) the court defines the scope of coverage under the insurance policy on which the insured relies and compares that scope with the allegations in the underlying complaint; and (3) the allegations of the underlying complaint potentially could support recovery under the policy. (*Id.* at 11–12 (citations omitted).) Put simply, "an insurer has a duty to defend if there is any possibility that its coverage has been triggered by allegations in the underlying complaint." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 674 (3d Cir. 2016) (citing *Jerry's Sport Center, Inc.*, 606 Pa. 584, 610, 2 A.3d 526,  541 (2010)).

As a matter of law, this Court held that the language of the Ongoing Operations Endorsement encompassed the acts or omissions of Penn National's insured, Flexicore, such that it triggered coverage of Cost under the Penn National Policy and Umbrella Policy. (*Id.* at 13.) The Ongoing Operations Endorsement covered bodily injury caused "in whole or in part" by the "acts or omissions" in "the performance of" Flexicore's "ongoing operations for" Cost Company "at the location or project described in the contract or agreement." (*Id.*) The allegation in the Underlying Complaint that Flexicore "negligently failed to have proper warnings or instructions concerning [the] use" of the concrete panel that killed Mr. Gonzalez could be considered an act or omission that played some role, in whole or in part, in causing the "bodily injury" at issue—Mr. Gonzalez's death. (*Id.* (quoting Underlying Compl., ¶ 98).) Therefore, the allegation in the Underlying Action "raised at least the possibility" that Mr. Gonzalez's death was caused in whole or in part by

Flexicore's acts or omissions and under the Ongoing Operations Endorsement it was this possibility that triggered Penn National's duty to defend Cost. *Ramara*, 814 F.3d at 674.

The Court was unconvinced by Penn National's argument that "ongoing operations" was equated with "work" or that Flexicore had to take some sort of affirmative action or exertion of effort on the project, as opposed to the delivery of the concrete panels. (ECF No. 48, at 14.) Notably, the Subcontract Agreement itself defined the scope of Flexicore's work to include "delivery to the project site." (*Id.*) Additionally, Paragraph 98 of the Complaint in the Underlying Action alleged that the death occurred because "the concrete panel was in a defective condition" and was "unreasonably dangerous to a user or consumer" because Flexicore "negligently failed to insure that the concrete panel conformed to the manufacturing specifications, negligently failed to have proper warnings or instructions concerning its use, and was negligently designed." (*Id.* (citing Underlying Compl., ¶ 98).) The Court concluded that case law squarely supported the premise that negligent failure to warn is a claim concerning a defendant's *conduct*. (*Id.* (citing *Bombar v. West Am. Ins. Co.*, 932 A.2d 78, 89 (Pa. Super. Ct. 2007); *Harford Mut. Ins. Co. v. Moorhead*, 396 Pa. Super. 234, 251, 578 A.2d 492, 501 (1990); *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Kaminski Lumber Co. Inc.*, 397 Pa. Super. 484, 487, 580 A.2d 401, 402 (1990); and *Devich v. Commercial Union Ins. Co.*, 867 F. Supp. 1230, 1234-35 (W.D. Pa. 1994)).) Accordingly, the Ongoing Operations Endorsement triggered Penn National's duty to defend Cost in the Underlying Action.

The Safety Provision in conjunction with the Ongoing Operations Endorsement also triggered that duty. The Provision made Penn National's insured, Flexicore, solely responsible for providing a safe place to work and adequate safety measures for the health and safety of Flexicore's own employees, agents, and subcontractors, as well as "other persons on and adjacent to the Work Site." (ECF No. 48, at 17.) It further obligated Flexicore to "take all necessary and prudent safety

precautions with respect to its work . . . for the safety of persons or property." (*Id.*) The Court concluded that the natural reading of this Provision was that Flexicore's safety responsibilities extended to Mr. Gonzalez, who was a person on the work site. (*Id.*) The Court recognized the broad liability that might be implicated by such a reading of the Safety Provision, but the Court held that the legal standard of whether the Underlying Complaint raised any *possibility* that Penn National's covered was triggered amply supported  the Court's conclusion that Penn National had a duty to defend Cost. (*Id.* at 18.)

Finally, the Court concluded in the alternative that the Completed Operations Endorsement also triggered the duty to defend. (*Id.*) That Endorsement contained language analogous to the Ongoing Operations Endorsement with respect to coverage for bodily injury caused in whole or in part by Flexicore's "work" at the location or project described in the Subcontract Agreement. (*Id.* at 7.) The Court again rejected Penn National's argument that Flexicore was sued for its *product* not its "work," as the term "work" was defined in the Subcontract Agreement and included delivery of the concrete panels and because negligent failure to warn can be considered conduct. Thus, the duty to defend was plainly triggered and this Court so held. That brings us to the question of whether Flexicore and Penn National had a duty to indemnify Cost and Liberty Mutual.

## II.        STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp., v. Catrett*, 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party measured against the standard fixed by the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In reviewing the record evidence submitted, the court is to draw all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48. An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See id.* "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587; *Huston*, 568 F.3d at 104.

## III.    DISCUSSION

The Court resolved the question of Penn National's duty to defend Cost in its previous Opinion, holding that Penn National did have such a duty. (ECF No. 48.) The question in this second go-around is whether Penn National had a duty to indemnify Liberty Mutual's insured, Cost, for the cost of Cost's defense and the settlement of the claims against it in the Underlying Action.  As explained below, the Court concludes as a matter of law that Penn National also had a

duty to indemnify Cost under the "Ongoing Operations Endorsement," under the Safety Provision

obligations in the Subcontract Agreement, and under the "Completed Operations Endorsement[3]."

It is well-settled under Pennsylvania law that as a general matter, the duty to defend and

the duty to indemnify are separate and distinct. *Regis Ins. Co. v. All Am. Rathskeller, Inc.*, 2009

Pa. Super. 99, ¶ 8 (2009). "Unlike the duty to defend, the duty to indemnify cannot be determined

merely on the basis of whether the factual allegations of the complaint *potentially* state a claim

against the insured." *Id.* (quoting *American States Ins. Co. v. State Auto Ins. Co.*, 721 A.2d 56, 63

(Pa. Super. 1998)) (emphasis added). Rather, the duty to indemnify arises only when the insured

is determined to be liable for damages within the coverage of the policy. *Britamco Underwriters,*

*Inc. v. Stokes*, 881 F. Supp. 196, 198 (E.D. Pa. 1995). In practice, this means that an insurer's

broader duty to defend where an underlying claim raises the possibility of coverage continues

"until such time as the claim is confined to a recovery that the policy does not cover." *Erie Ins.*

*Exch. v. Transamerica Ins. Co.*, 516 Pa. 574, 583 (1987). For instance, in *Lang Tendons, Inc. v.*

*Northern Ins. Co. of New York*, Judge Bechtle wrote:

> [W]here there has been no adjudication of liability because the
> insured has settled the claims against it, and no apportionment of the
> settlement amount among the different counts of the underlying
> complaint, the court must determine whether an equitable
> apportionment between covered and uncovered claims must be
> made. . . . Thus, in order for Lang to be entitled to damages for
> breach of the duty to indemnify, **it must first demonstrate that its**
> **liability to Central actually falls within the policy's coverage**.
> Second, the court would have to equitably apportion the settlement
> figure to the claims that Lang demonstrates are **actually covered** by
> the policy.

---

[3] Liberty Mutual contends that there is simply no triable issue as to an indemnity obligation under the Safety Provision, in that Mr. Gonzalez died because of his failure to follow safety procedures on the jobsite, that Flexicore conceded under its contract with Cost that it, Flexicore, would be "solely responsible" for all safety matters, and that the only reasonable interpretation of that contract put Flexicore on the liability hook when Mr. Gonzalez was killed while being in a position he was not to be in. ECF No. 80 at 27.

No. CIV.A. 00-2030, 2001 WL 228920, at \*11 (E.D. Pa. Mar. 7, 2001) (citing *Safeguard Scientifics*, 766 F. Supp. at 334) (emphasis added).

Of course, a determination that a claim is without coverage may require consideration of the underlying facts. Thus, a determination that an insurer has no duty to indemnify can be frustrated, perhaps irrevocably frustrated, by a settlement agreement among the parties to an underlying lawsuit. Our Circuit has held that the duty to indemnify follows the duty to defend where "settlements in the underlying suits . . . preclude such . . . factual determinations." *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 766 (3d Cir. 1985). A further complication occurs where an insurer (here, Penn National) refuses to defend and the action is later settled with no trial. On this issue, "when an insurer declines coverage and refuses to negotiate on the grounds that the matter is not covered by the policy, it does so at its own peril." *TIG Ins. Co. v. Nobel Learning Communities, Inc.*, No. CIV. A. 01-4708, 2002 WL 1340332, at \*12 (E.D. Pa. June 18, 2002). And, "[i]f it is determined that the insurer is obligated to indemnify for the incidents in question, the insurer must usually accept the apportionment arrived at in the negotiations it rebuffed." *Id.*

This case turns on the application of Pennsylvania state law. Penn National argues the Pennsylvania intermediate appellate courts have not given *Linn* full-throated acceptance. In *American States Insurance Co.*, the appellant, citing *Linn*, contended that the insurer should be estopped from presenting evidence that the underlying claim was not covered for indemnification purposes after it breached its duty to defend and the underlying case settled. 721 A.2d at 63. The Pennsylvania Superior Court, in affirming the trial court's rejection of that proposition, held that *Linn* is limited to situations where determination of coverage is rendered impossible by the existence of a settlement, multiple theories of liability, and multiple insurers. *See id.* at 64. However, in that case before the Pennsylvania Superior Court, the issue that required a

determination (whether a vehicle involved in an accident was covered by the policy terms) would not have been resolved by the underlying litigation even if it had gone to trial.[4] *Id.* Therefore, settlement had not rendered the determination of coverage impossible. The Superior Court accordingly stated that "we will not adopt a blanket rule that if there is a breach of a duty to defend and a settlement, then it automatically requires the breaching insurer to indemnify. . . . [A] duty to indemnify requires an inquiry into whether there was actual coverage for the underlying claim." *Id.*

The Superior Court came to the same result more recently in *Regis Ins. Co.*, 2009 Pa. Super. 99, ¶ 8. The *Regis* court reversed the trial court, which found the insurer owed a duty to indemnify because the underlying claims did not clearly fall within a policy exclusion and because the underlying case settled, preventing facts from being developed that would allow the insurer to argue that the claims were excluded. *Id.* ¶ 4–7. In reversing the trial court, the Superior Court rejected the same "blanket rule" discussed in *American States Insurance*:

> No such blanket rule exists in Pennsylvania. In fact, such a rule is contrary to the purpose of filing a declaratory judgment action to determine coverage issues. Regis' declaratory judgment action was filed for the purpose of determining, *inter alia*, whether Regis has an indemnity obligation to Rathskeller. As a matter of law and to the extent necessary, Regis was entitled to an opportunity to introduce evidence proving the applicability of the subject exclusion.

*Id.* ¶ 9. The court went on to say that it is "common practice" for insured and insurance companies to file declaratory judgment actions in disputes like these and that the court has repeatedly held that such actions are "particularly appropriate" in the insurance coverage context. *Id.* ¶ 9 n.7

---

[4] Notably, here the outcome would have been the opposite, namely that a trial of the Underlying Action would have actually resolved who among the defendants in that case were liable to the Gonzalez estate, and to what degree, including as to both or either of Cost and Flexicore.

(quoting *Pressley v. Travelers Property Cas. Corp.,* 817 A.2d 1131, 1138 (Pa. Super.2003)).

The *Regis* Court addressed *Linn* in a footnote. Citing to the decision in *American States Insurance*,  the Superior Court  limited its reading of  *Linn* as applying to situations where "the duty of several competing insurers to indemnify [is] automatic after a settlement of lawsuits [that are] based on multiple theories of liability [and] the settlement made it impossible to determine which of the multiple insurers had a duty to indemnify." *Id.* ¶ 9 n.8.

Since then, the Third Circuit appears to have carefully delineated its *Linn* opinion as well, focusing its applicability on situations where the determination of an insurer's duty to indemnify is impossible due to the presence of multiple theories of liability and multiple competing insurers, all followed by a global settlement that preluded a determination of the actual liability and apportionment of any liability as between several defendants. *See Am. W. Home Ins. Co. v. Donnelly Distribution, Inc.,* 523 F. App'x 871, 875 (3d Cir. 2013) ("[U]nlike *Linn*, this case involves only one insurer and liability is based on a single theory. There is nothing to indicate that in this case settlement made it impossible to determine whether coverage under the Policy was warranted.").[5]

In *12th Street Gym, Inc. v. General Star Indemnity Co.*, 93 F.3d 1158, 1167 (3d Cir. 1996), the Third Circuit had refined the basis for its ruling in *Linn*. The Court wrote, "our holding [in *Linn*] was based, in part, on the concern that an insurer would be able to settle a suit without an agreement with the insured, and attempt to avoid its duty to indemnify by claiming a jury would have found the claims in the underlying suit were not covered by the policy." *Id.* Thus, where an insured participated and acquiesced in the settlement of the underlying case, the insured is "not

---

[5] Here, there were multiple claims asserted against multiple parties in the Underlying Action, and even though Penn National was involved as to both Flexicore and Cost, the status of each was different under the applicable insurance policies, and as this case reveals, as to Cost, there were at least two carriers involved, the Plaintiff and Defendant here.

exposed to the risk that influenced the *Linn* decision." *Id.* Because the insureds in that case had participated and acquiesced in the settlement, they were not exposed to that risk and so the Third Circuit held that the lower court correctly denied their motion for summary judgment. *Id.* The *12th Street* Court cited to *Safeguard Scientifics, Inc. v. Liberty Mutual Insurance Co.*, 766 F. Supp. 324, 334 (E.D. Pa. 1991), *aff'd in part, rev'd in part*, 961 F.2d 209 (3d Cir. 1992), which stated "[t]he Third Circuit has subsequently clarified the holding in *Linn*, finding it inapplicable to a case . . . where the insured, rather than the insurance company, settled the case." *See also Cooper Labs., Inc. v. Int'l Surplus Lines Ins. Co.*, 802 F.2d 667, 674 n.1 (3d Cir. 1986) ("In [*Linn*], this court noted that by settling without an agreement with the insured, the carrier conceivably could foreclose any right of indemnification by the insured. Here, by contrast, the insured settled the case so it is not exposed to the risk that influenced the *Linn* decision.") (applying New Jersey law).

But most recently, our Court of Appeals has acknowledged the current vitality of its *Linn* decision, along with the essential principle that led that court to affirm the district court in *Linn*: where there are multiple claims involving multiple parties coupled with a global settlement in an underlying lawsuit, and the defendant insurance carrier in the "follow along" indemnity litigation had by its actions opted out of defending the underlying lawsuit even under a reservation of rights, and there are no factual findings in the underlying lawsuit to consider in determining whether that insurance carrier had any indemnification duty, "the duty to indemnify must follow the duty to defend." *SAPA Extrusions, Inc. v. Liberty Mutual Ins. Co*., 939 F. 3d 243, 250, n. 3 (3d Cir. 2019) (quoting *Linn*, 590 F. Supp. at 650 (E.D. Pa. 1984)). In this Court's estimation, this is not a "blanket rule" by any measure but is instead quite focused, and means that the Third Circuit's precedential *Linn* decision remains good, and applicable, Circuit law.

Thus, it appears to the Court that the two prerequisites for indemnification under the "*Linn* Rule" are: (1) that the nature of the case as being one with multiple parties, multiple theories of liability, and settlement making liability among competing parties impossible to determine and (2) there must be a concern that an insurer could foreclose indemnification by its conduct relative to the underlying lawsuit.[6] When those factors converge, the indemnity obligation follows the duty to defend.

There are also rational reasons for applying this approach here. As one court from this Circuit observed, "[the] rule is eminently prudent and practical, for without it, settlement would be difficult. Especially among several parties with potential liability, one misguided party's refusal to join in the negotiations could thwart an equitable settlement that pleases all other parties." *Am.*

---

[6]   *TIG Insurance,* which the Plaintiff cites and which relies on *Linn,*  states, "[w]hen an insurer refuses to defend and an insured settles, '[i]n order to recover the amount of the settlement from the insurer, *the insured need not establish actual liability to the party with whom it has settled so long as a potential liability on the facts known to the insured is shown to exist, culminating in a settlement* in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured.'" *TIG Ins. Co.*, 2002 WL 1340332 at *12 (quoting *Am. Int'l Underwriters Corp. v. Zurn Indus., Inc.*, 771 F. Supp. 690, 701–2 (W.D. Pa. 1991) ["*Zurn*"]) (emphasis added). *TIG Insurance* and the *Zurn* case it cites both clarify that "*if* it is determined that the insurer is *obligated to indemnify* for the incidents" then they must usually accept the settlement "arrived at in the negotiations it rebuffed." *Id.* (emphasis added); *Zurn*, 771 F. Supp. at 702 (similar). Thus, in what might appear to be positions in tension, both cases appear to say that an erroneous refusal to defend, which the Court has already found here, requires the refusing insurer to indemnify any later settlement, without any need to establish actual liability under the policy, *if* it is determined that the insurer *is obligated to indemnify*.

But, as noted below, Penn National contends that any indemnity obligation here actually does require a determination of "actual liability" for claims in the Underlying Action to demonstrate that they fall within the policy coverage, which would end up creating a degree of circularity, namely you don't need to prove liability unless you do. *See Britamco*, 881 F. Supp. at 198. For the reasons set out below, the Court concludes that a core teaching of *Linn* is that the carrier that defaulted on its duty to defend and then participated in the resolution of the underlying litigation, but not on behalf of the plaintiff/insured, cannot find shelter from indemnity in that circularity of argument. And in any event, this Court harbors significant doubt that any such circularity was intended by the Court in *TIG Insurance*. After all, as that Court noted, "an insurer who breaches its obligation to defend is estopped from arguing that the settlement represented claims outside those covered under the policy because an insurer 'cannot stand aside while the underlying case proceeds and only after it is settled seek to dissect it.'" *TIG Insurance* at *17 (quoting *Princeton Ins. Co. v. LaHoda*, No. 95-5036, 1996 WL 11353, at *5 (E.D. Pa. Jan. 4, 1996)).

*Int'l Underwriters Corp. v. Zurn Indus., Inc.*, 771 F. Supp. 690, 702 (W.D. Pa. 1991). This was especially the case in *Zurn* because, similar to the situation in this action, the insurers "dawdled for so long on this matter." *Id.* at 701 (citation omitted). That concern (albeit in a slightly different flavor) is also present in this case. Under the Defendant's theory, an insurer could apparently do nothing for years, be involved in the underlying case and settle out for one insured, watch as another asserted insured (here Cost) who has claimed the right to both a defense and indemnity coverage by that insurer also settles out with no support from the defaulting insurer, continue to do nothing, and then force an "after the fact" trial on the liability issues in the underlying case that those settlements affirmatively avoided. And no less, they would get to do so in a bench trial rather than before a jury that may well have been unsympathetic in the context of the workplace death of an innocent worker, which was the origin of this entire case. And it is that sort of tactical maneuvering by the non-indemnifying carrier that the *Linn* indemnity principles noted above are meant to address.

Distilled down, here is what the record reveals happened here. There was a tragic death of a workman whose claims as pleaded would have likely created a sympathetic plaintiff's case at the trial of the Underlying Action. That was where that case was headed until it settled. With regard to that Underlying Action, Cost demanded that Penn National defend Cost's interests in the Underlying Action. Penn National instead went on "radio silence," first ignoring that defense demand altogether, and then declining to defend Cost throughout the mediation process that settled the Underlying Action. Penn National nonetheless participated in that settlement process on behalf of Flexicore, right alongside of Cost (whose interests were represented by Liberty Mutual, its own insurer, in light of Penn National's cold shoulder). While Penn National was ignoring its duty to defend Cost, it also bypassed the opportunity to advocate for "no liability" on the part of Flexicore

or Cost at a time in which all of the Defendants in the Underlying Action faced the risk of both liability and a substantial damages verdict on one or more of the numerous counts asserted in the Underlying Action in a trial. So, to end its risk, Cost (via Liberty Mutual) fronted the money necessary to settle the death claim (and avoided the risk of a significant verdict at trial for the death of a jobsite worker) with no help from Penn National[7].

With the Underlying Action resolved as to all defendants, and after bypassing the opportunity (or in this case, duty) to defend Cost in the Underlying Action, Penn National only now wants to litigate *that* case in *this* case, specifically whether Flexicore could have been on the liability hook had that Underlying Action gone to trial in such a way as to require coverage of Cost as an "additional insured" under the Policy, and thus would become a trial as to whether and what Penn National's obligation would have been to Cost. This is exactly the sort of *post-hoc* "dissection" of the Underlying Action that the Courts in *TIG Insurance* and *LaHoda* rejected.

But also consider the advantage that Penn National has gained from its own choices and resulting actions. First, Cost was forced to extricate itself from the Underlying Action or face the risk of a substantial verdict in a situation in which Penn National had accomplished an exit strategy for its primary insured, Flexicore, and with every signal from Penn National being that they would not respond to any liability verdict against Cost. Then, with Cost (via Liberty Mutual) having fronted the funds necessary for the settlement of those claims, Penn National would now require Liberty Mutual (standing in Cost's shoes) to take *this* case to trial to essentially prove the fact and amount of liability *against Cost and Flexicore* as to the claims in the Underlying Action if it wanted indemnity, but in a fundamentally different environment than that which would have

---

[7] Which by virtue of its $300,000 settlement payment on behalf of Flexicore, Penn National had assigned some substantial value to the liability and damages risk to Flexicore in the Underlying Action.

existed had the Underlying Action gone to trial (a jury trial involving the claims of the family of a deceased construction worker, as opposed to a damages bench trial between two insurance carriers in this Court). In substance, Penn National's refusal to defend and participate on behalf of Cost set up a "hostage situation" for the benefit of Penn National by forcing Cost to make settlement decisions while facing the risks attendant to that jury trial, all while Penn National was actually present and participating in the settlement talks for Flexicore, and with Penn National reserving the "fight" about actual liability to the Gonzalez estate, and hence its coverage obligations to Cost, for a later bench trial.

Effectively, by its conduct, Penn National took just about every step it could to put Cost in the unfavorable and essentially untenable position of risking trial or settling the underlying action (which Cost, through Liberty Mutual, did elect to settle) and then avoided its own potential duty to indemnify by first remaining silent for years, then refusing to defend Cost in the Underlying Action, sticking with its denial of coverage through the settlement of the Underlying Action, ECF No. 80 at 33, and finally holding out until it had to be sued by Liberty Mutual here. And now Penn National wants to force a trial on the facts of the Underlying Action, one in which Cost would have to prove that it and Flexicore[8] were liable to the Gonzalez estate in the Underlying Action to recover indemnity, and when the genesis of that Underlying Action was Mr. Gonzales' death, which occurred nearly ten years ago.

This is the type of concern our Court of Appeals said was one focus of the holding in *Linn*, namely "the concern that an insurer would be able to settle a suit without an agreement with the insured and attempt to avoid its duty to indemnify by claiming a jury would have found the claims

---

[8] See ECF No. 66 at 23-24, specifically denominated textual parantheticals at (7), (10), (11), (12), and (14).

in the underlying suit were not covered by the policy." *12th Street Gym*, 93 F.3d at 1167. In these somewhat different circumstances[9], even though Cost and Liberty Mutual elected to settle the claims against Cost in the underlying action, they were for the reasons noted nonetheless exposed to the same type follow-along litigation risks that animated the analysis in *Linn*, since by its inactions (failure to respond or defend) and then actions (settling the Underlying Action as to Flexicore), Penn National eliminated any ability to sort out in the Underlying Action who would have been found liable (including as to Flexicore and Cost[10]) and to what degree, and then flowing from those conclusions, the degree to which there were any potential indemnity coverage issues[11].

---

[9] Penn National contends that *Linn* would provide relief only to the an "insured left out holding the bag and not a subrogation action filed by a primary insurer. . ." ECF No. 80 at 31. It appeared to the Court then, and now, that Penn National was arguing that *Linn* could provide relief to an *insured* that settles a claim with its own funds, but not to a primary carrier who stands in the shoes of that same insured in a subsequent subrogation action. ECF No. 80 at 31-35. It has offered no rationale for that distinction, *id.* at 36-37, other than contending that primary insurers should be treated differently than a private party insured, and that Liberty Mutual could have filed a declaratory judgment action to sort this out, presumably in the midst of the settlement process in the Underlying Action. *Id.* Penn National has offered up no rule of law that would differentiate between the rights of an insured and those of an insurer that had stepped up and now seeks recovery via subrogation.

[10] There were four other defendants in the Underlying Action. ECF No. 1-2 at 5.

[11] And Penn National argues that it is such a liability finding and then allocation that are central to whether there is an indemnity obligation *vel non* in this case, requiring the "trial" of the Underlying Action in this case. ECF No. 80 at 39-40. But that was the analysis directly rejected by the Court in *TIG Insurance*. Relying on *Zurn Industries*, that Court noted that the settling party that was seeking indemnity did not have to establish the underlying liability that the insurance carrier said was essential to trigger the indemnity obligation, "so long as a potential liability on the facts known to the insured is shown to exist, culminating in a settlement in an amount reasonable in view of the size of the possible recovery and degree of probability of claimant's success against the insured." *TIG Insurance*, 2002 WL 1340332 at *12 (quoting *Zurn Industries*, 771 F. Supp. at 702).

This Court in its earlier Opinion on the "duty to defend" held that the "potential liability" as to Cost was plain as day, and the duty to defend was triggered under multiple provisions of the Polices, and the parties here and their insureds would seem to have concurred in that assessment. After all, Penn National paid more than $300,000 to settle the claims against Flexicore and has agreed that the $850,000 Liberty Mutual paid to settle the claims against Cost was reasonable. ECF No. 62 at ¶ 136. So in the Court's estimation, no party here can credibly claim that the requisite "potential liability" referenced in *TIG Insurance* was or is missing. Given those dollar amounts, and the risks attendant to a jury trial in the Underlying Action, it would appear to the Court that based on the amounts paid and Penn National's concession of reasonableness of the Cost settlement, it is beyond dispute that the settlements in the Underlying Action plainly reflect the parties' accurate assessment of the "size of possible recovery and the degree of the claimant's success against the insured [Cost]" in the Underlying Action.

Since the global settlement of the Underlying Action resolved all claims and defenses in that case, in this Court's judgment, the principles of *Linn* foreclose the Defendant from now forcing the Plaintiff to now try the Underlying Actions in the forum of this case.

The Court concludes that the second element of the *Linn* Rule outlined above is satisfied in that Penn National settled the case for its insured, Flexicore, but without its additional insured, Cost, and now seeks to foreclose indemnification and relitigate both the liability issues from the Underlying Action, and any coverage defenses, here[12]. In this Court's estimation, such is contrary to the guidance from *Linn*.

Additionally, that the death of the worker litigated in the Underlying Action would be the type of injury which the Policy would cover is without doubt. (*See e.g.*, ECF No. 64-2, at 105 ("liability for 'bodily injury' . . . caused, in whole or in part, by . . . [y]our acts or omissions").) And in its "duty to defend" Opinion, the Court set out the provisions of the Policy that provided coverage to Cost on the Penn National Policy, so that if Flexicore were tagged with liability in the Underlying Action, the policy would have covered that claim and any liability that Cost would have also had as an additional insured. There were multiple claims involved in the Underlying Action against multiple defendants (ECF No. 1-2 (twelve (12) counts against six (6) defendants)), triggering the first element of the *Linn* Rule, whereby the duty to indemnify follows the duty to

---

[12] It is actually more acute than that, as Penn National argues that it would only be obligated to indemnify here if Flexicore was actually found liable for the claims in the Underlying Action. ECF No. 80 at 25. But, of course, Penn National cut that determination off at the pass by settling the Underlying Action as to Flexicore. ECF No. 80 at 25-29. So under Penn National's theory of the case, a party in Cost's shoes would be faced with a major Hobson's Choice in litigating the Underlying Action. Settle out with its (or Liberty Mutual's) money knowing that would have to still litigate that Underlying Action here to obtain indemnity, or not settle the Underlying Action as to itself, and then at that jury trial, argue that the "empty chair" of Flexicore was actually liable. Unless Flexicore were nonetheless forced to show up and participate in that trial in the Underlying Action, Cost would be in the very difficult position of trying to affix liability to the absent Flexicore in that proceeding. Not to mention that Flexicore's position here would seem to run counter to the favor that settlement of the Underlying Action would seem to possess under the law.

defend where there are multiple claims, multiple parties, multiple insurers, and a settlement in the Underlying Action that precludes a determination on the facts of that case relative to liability and its apportionment. In theory, it would be literally possible to assess Flexicore and Cost's underlying liability to the plaintiff in the Underlying Action *post hoc* by "trying" the Underlying Action as part and parcel of this case. But that is really an illusory concept, because by its decisions and conduct, Penn National has entirely and irrevocably altered the context for those decisions by dodging the risk of any of that being decided by the jury in the crucible of the litigation of the Underlying Action with all of the claims and defenses on the table, and then in essence swapping out the jury factfinder for this Court. How the questions of liability of and between the defendants in the Underlying Action would have been resolved in that jury trial cannot not now be captured with any accuracy in the context of an after-the-fact declaratory judgment non-jury trial in this Court. But those are the questions that Penn National now says must be resolved to determine whether it had any indemnity duty at all. In this Court's estimation, the second prong of Linn tells us that "now" is simply too late[13].

_____

[13] It also appears that it is Penn National's view that Cost and Liberty Mutual should have somehow paused the litigation of the Underlying Action to pursue a declaratory judgment action to resolve the indemnity issue before there were settlement talks in the Underlying Action. Putting aside for the moment that Penn National offers no basis to conclude that the deceased worker's family would have willingly hit the "pause button" in that underlying case to allow that *inter partes* insurance coverage litigation to proceed and resolve before the Underlying Action went forward, Penn National's position in that regard ignores the reality that it, too, could have instituted just such a proceeding, which it did not. ECF No. 80 at 34-35. And to the extent that Penn National suggests that a declaratory judgment action is the appropriate vehicle to now determine after the fact whether Penn National had a duty to indemnify, in the Court's estimation that suggestion would run counter to one of the principles of *Linn*, namely avoiding the situation in which an insurer could pass on its duty to defend, and then argue after the global settlement that the jury in the underlying case would have found liability (if at all) only as to claims outside of the coverage. Both *TIG Insurance* (and *LaHoda*, which it relied upon) and *12th Street Gym* rejected that formulation. And in any event, such a proceeding would not be a run-of-the-mill declaratory judgment action in which a court is called upon, for instance, to construe the language of an insurance policy, but would instead be a wholesale merits trial of the Underlying Action.

In hedging its bets by giving Cost the silent treatment in terms of a defense and then its participation on Flexicore's behalf in the settlement talks that resolved the Underlying Action, Penn National also avoided an obligation to ameliorate the risk that Cost faced in that case. In those circumstances, Penn National, consistent with *Linn,* should be and will be estopped to now challenge the necessity for and amount of the settlement for a death claim otherwise of the type covered by the Policies that Cost entered into in the Underlying Action. To hold otherwise would reward the inequitable conduct Penn National engaged in here. Therefore, because *Linn's* principles lead to that result, and because *Linn* remains sound law in this Circuit, this Court will apply those principles in this case and enter summary judgment in favor of Liberty Mutual.

An appropriate Order will enter for the Defendant Penn Nation to pay the Plaintiff Liberty Mutual for the costs of settlement of $850,000, (ECF No. 64-20, at 2), which the Defendant admits was a reasonable settlement amount, plus prejudgment interest at the statutory rate from the date that the settlement was paid.

As to Liberty Mutual's claim for fees and costs in litigating this case, any such award will be a question of state law. *Montgomery Ward & Co. v. Pac. Indem. Co.*, 557 F.2d 51, 56 (3d Cir. 1977) ("state rules concerning the award of attorneys' fees are to be applied in diversity cases whether these rules provide for an award or deny it, provided such rules do not run counter to federal statutes or policy considerations"). Because those matters have yet to be fully developed in this record, Liberty Mutual will be provided an opportunity to support that claim with a supplemental filing on that topic, with Penn National being provided the opportunity to respond. The Court would also suggest that such issues would likely be the subject of one or more factual stipulations.

Liberty Mutual's Motion of Summary Judgment is granted in the amount of $850,000, plus pre-judgment interest in the amounts provided by law. An appropriate Order will enter.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:  November 6, 2020

cc:  All counsel of record